IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES ROBERT HARRIS, | No. CIV S-07-0775-CMK |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the consent of the parties, this case is before the undersigned for final decision on plaintiff's motion for summary judgment (Doc. 17) and defendant's cross-motion for summary judgment (Doc. 18).

/ / /

/ / /

/ / /

/ / /

## I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on July 13, 2004.[1] Plaintiff claims his disability consists of a combination of "depression, borderline intellectual functioning, and other mental disorders." Plaintiff's claim was initially denied. Following denial of his request for reconsideration, plaintiff requested an administrative hearing, which was held on May 9, 2006, before Administrative Law Judge ("ALJ") Theodore T.N. Slocum   In his September 13, 2006, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since at least July 13, 2004;

2. The medical evidence establishes that the claimant has severe antisocial personality disorder, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4;

3. The allegations of the claimant, his mother, and the third-party, referenced above, purporting to show that the claimant would be too mentally impaired to perform the requirements of his past relevant work, cannot be credited because such assertions are not shown to be a reasonable consequence of his medically determinable impairment;

4. The claimant has the residual functional capacity to perform work-related activities . . . involving no physical limitations, and with moderate limitations in the claimant's capacity to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances due to his personality disorder and motivation; to interact appropriately with the general public; and to respond appropriately to changes in work setting; additionally, the claimant is moderately restricted in activities of daily living and in maintaining social functioning, and mildly limited in maintaining concentration, persistence, or pace;

5. The claimant's past relevant work as a yard laborer did not require the performance of the work-related activities precluded by the above limitation(s);

6. The claimant's impairment does not prevent the claimant from performing his past relevant work; and

---

[1] Plaintiff states in his motion for summary judgment that he filed for benefits on September 13, 2004. He references certified administrative record ("CAR") pages 28-29 in support of this contention. However, the document at that part of the record, which is an agency "Disability Determination and Transmittal," confirms that the filing date was July 13, 2004.

      7.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision.

After the Appeals Council declined review on March 29, 2007, this appeal followed.

## II. SUMMARY OF THE EVIDENCE

The certified administrative record contains the following: (1) medical records covering the period from July 3, 2002, through August 4, 2004 from the California Department of Corrections and Rehabilitation ("CDCR") (Ex. F1, CAR 89-153); (2) report of agency doctor Timothy Canty, M.D., following a September 25, 2004, psychiatric evaluation (Ex. 2F, CAR 154-57); (3) an October 12, 2004, mental residual functional capacity assessment and psychiatric review technique form completed by agency physician Susan Regan, M.D. (Ex. 3F, CAR 158-65); (4) a March 2005 evaluation completed by agency consultative physician Charlotte Bible, M.D. (Ex. 5F, CAR 166-68); and (5) medical records covering the period from January 22, 2006, through March 24, 2006, from CDCR (Ex. 6F, CAR 170-91).

The CAR also contains records relating to a prior application for benefits filed in June 2003. Notable among these records are the following: (1) a report by agency physician David C. Richwerger, Ed.D., following an August 10, 2001, psychological evaluation (CAR 370-75); and (2) a report by agency physician Barry N. Finkel, Ph.D., following a September 22, 2003, psychiatric evaluation (CAR 278-81).

Before continuing, the court notes that plaintiff has a history of incarceration in state prison. Specifically, the record reflects that plaintiff has been incarcerated on several occasions for violating restraining orders, carrying a concealed weapon, and assault and battery. Plaintiff has a history of juvenile and adult criminal violations and, prior to 2001, plaintiff had been incarcerated for two or three years. He was also incarcerated from June 2002 through July 2003, when he was released on parole. Plaintiff was arrested in November 2003 and returned to prison in December 2003. He was released again in May or June 2004. Plaintiff was last in

prison between January and March 2006, at which time he was again released on parole. Plaintiff filed applications for social security benefits at or near the times of his parole dates in 2003 and again in 2004. It also appears that plaintiff filed an application sometime prior to initial incarceration in June 2002.[2] The current record does not indicate whether plaintiff filed a third application following his release in March 2006.

The following is a chronological summary of plaintiff's medical records.

<u>2001</u>

At the request of the agency, David C. Richwerger, Ed.D., conducted a psychological evaluation and completed a report of his findings on August 10, 2001. Plaintiff told Dr. Richwerger that he has a severe learning disability and cannot read or write more than his name, although he also stated he completed high school. Plaintiff also stated that he began having problems with depression "several years ago," although he denied any prior psychiatric hospitalization, treatment, or counseling. As to plaintiff's psychiatric history, Dr. Richwerger reported:

> The claimant states he has difficulty concentrating and difficulty with his memory. The claimant denied auditory or visual hallucinations. The claimant states he has troubling thoughts and sometimes feels depressed. The claimant denied suicidal ideation; however, he states that a few days ago he did not feel like he wanted to be here anymore, but he had no suicidal intent or plan. The claimant denied homicidal ideation. The claimant is not currently seeing a psychiatrist or therapist. The claimant states he takes medications for his high blood pressure. He takes no psychiatric medications at this time.

Dr Richwerger also reported on a prior head injury:

> . . . The claimant states he was in a motor vehicle accident and had a head injury. The claimant did not know if there was any period of unconsciousness. The claimant had the motor vehicle accident when he was 14 years old, according to the claimant.

///

---

[2] This is indicated by Dr. Richwerger's August 2001 report, which was completed at the request of the Department of Social Services.

As to plaintiff's level of functioning at the time of his report, Dr. Richwerger noted:

> The claimant lives in a trailer alone. The claimant stated he does not sleep well, and his appetite is okay. The claimant states he does laundry, takes out the trash, does household chores, goes places with his family, and takes care of his own personal needs. The claimant states his hobbies are working on motors. The claimant states he handles his own financial affairs. The claimant states he gets around via a car. The claimant is able to move about alone. The claimant got a ride to this evaluation. The claimant states he gets along pretty good with family and relatives but does not interact much with friends and neighbors. The claimant states that on a daily basis he has been feeling very sick and weak, and he states he thinks this maybe because of his cancer.

Dr. Richwerger administered a series of diagnostic tests and recorded his observations. As to plaintiff's intellect, the doctor noted:

> The claimant was oriented to time, person, and place. The claimant did know the purpose for the evaluation. Verbal response time was within normal limits, not delayed, and not diminished. No articulation problems were noted. Thought processes were clear, rational, but quite concrete. The claimant appears to understand simple tasks. He does have difficulty with complex tasks.

Dr. Richwerger assessed plaintiff's full-scale IQ at 62, which is mildly impaired. The doctor indicated that plaintiff "appeared to have difficulty globally across most subscales of the WAIS-III [test]." Memory was reported as ranging from mildly impaired to borderline. Dr. Richwerger diagnosed depressive disorder with mild mental retardation and antisocial personality traits and assigned plaintiff a global assessment of functioning ("GAF") score of 55 out of 100. As to plaintiff's functional abilities, Dr. Richwerger opined as follows:

> The claimant would likely have difficulty with detailed and complex tasks. The claimant is able to perform simple and repetitive tasks. The claimant has the ability to maintain adequate concentration, persistence, and pace, but only on tasks that are simple and repetitive. The claimant appears to have the ability to maintain basic social functioning. The claimant interacted well throughout the testing period. The claimant appears to have the ability to adapt to the usual stresses encountered in competitive work as long as he is doing simple and repetitive tasks. The claimant, however, had significant difficult with mathematics tasks, and it appears that the claimant should get help in managing his own funds. The claimant appears to be not capable of managing his own funds well.

///

<u>2002</u>

On June 24, 2002, plaintiff answered questions on a form entitled "Health Screening for Newly Arrived Inmate-Patient." When asked whether he was currently under a doctor's care for a medical or psychiatric problem, plaintiff responded "yes" and noted "lung problem." He did not indicate any psychiatric care. He also stated that he does not have any special health care needs. He stated that he had never been diagnosed or treated for mental illness or attempted suicide. Plaintiff specifically answered that he does not have a current mental health problem, and none was observed by prison officials at the time the form was completed. On a "Medical History" form completed the same day, plaintiff again indicated that he does not have any history of psychiatric problems.

On August 2, 2002, plaintiff answered questions on a "Standardized Bus Screening Form." Again, he stated that he had never been treated for mental illness or attempted suicide. The only problems he noted were "dental" and an inability to read or write as the result of an injury sustained in a childhood auto accident.

The first mention in plaintiff's prison record of any mental problems occurred on October 15, 2002. Physician's progress notes from this date indicate that plaintiff complained of "anxiety & feels depressed because no word from his family." Plaintiff denied suicidal ideation. Plaintiff complained of depression again in late 2002, and was "referred to psych."

<u>2003</u>

Prison medical records indicate that, by March 2003, plaintiff was on psychiatric medication. Mental health progress notes dated March 25, 2003, reveal that plaintiff's behavior was cooperative and alert, and that his speech was clear. The doctor noted that plaintiff "is more forward looking" and assigned a GAF of 60.

///

///

///

1   Progress notes from April 3, 2003, show that plaintiff was still taking psychiatric

2 medication. On April 27, 2003, the staff psychologist entered the following progress note:

3      Spoke with inmate concerning chrono written to adjust his work hours.
       Inmate stated he is only able to work several hours in the afternoon due to
4      the sedating effects of his medications. The housing unit officer stated this
       is impossible. Inmate was consulted concerning custody response. Stated
5      he will request that he be unassigned from his current assignment.

6   In May 2003, plaintiff told a prison doctor that he was "really stressed out"

7 because "I'm leaving really soon." The doctor noted that plaintiff's mood was anxious and that

8 his appetite was poor, but that his sleep was good due to medications plaintiff was taking at

9 night. The doctor also noted that plaintiff was not experiencing auditory hallucinations, but

10 increased paranoia due to numerous fights in plaintiff's housing unit. Plaintiff was assigned a

11 GAF of 55.

12   Following his release, plaintiff filed another application for social security

13 benefits in June 2003. Incident to this application, agency psychologist Barry N. Finkel, Ph.D.,

14 conducted a psychiatric evaluation. Dr. Finkel indicated in his report that "[p]resenting problems

15 concern hallucinations, depression, and illiteracy." Plaintiff reported that he completed high

16 school and was never in special education classes. As to mental status, Dr. Finkel reported the

17 following:

18     The claimant is alert. He incorrectly identified the year as 2002. Asked
       the month, he said "the seventh month." He incorrectly identified the day
19     of the week (Monday) as Tuesday. It is noted that he had previously
       indicated knowledge of the date in discussing parole release dates. Speech
20     is normal in rate and flow. Thinking is logical and goal oriented. The
       claimant states he began hearing a voice about five years ago. He said he
21     calls the voice "Billy Bob." Billy Bob tells him to do things and he argues
       with the voice, saying he does not want to do it. Sometimes he hears
22     another voice. He said the voices began suddenly with no precipitating
       event. The voices have occurred off and on through the day. He indicates
23     "the voices are pretty much stopped" since he began treatment with
       medication. He is receiving Seroquel, Paxil, and Trazodone. He reports
24     feeling depressed and paranoid. He said his wife left him in 1999. He
       said she had obtained restraining orders, which he violated. He intended
25     to commit suicide after she left him. He said he was arrested with two
       bombs, a sawed-off shotgun, and two revolvers. He is currently being
26     treated at the parole outpatient clinic. He denies any prior mental health

7

history.

Dr. Finkel administered a number of diagnostic tests, but stated that the "results are not valid due to malingering." Specifically, Dr. Finkel reported:

> IQ scores were not computed as testing is not valid. For example, he said he did not know the day after Saturday. Asked the shape of a ball, he said "octagon." Asked the number of months in a hear, he said "ten."
>
> * * *
>
> Mental control items were all failed. He said he was unable to count backward from 20 to 1 by 1's. Asked to count forward from 1 to 10 by 1's, he said 1-2-4-6-7-8-9-10. There were significant pauses prior to the omissions. He was able to recite the alphabet to the letter G only.
>
> The claimant was unable to complete the sample items on Trails I, which involves connecting the number 1 through 8 in sequence. In Fact, he was unable to connect the numbers 1 and 2, despite two attempts. He drew lines connecting the numbers 1-4-3-2.
>
> Reproductions of Bender designs showed significant distortions, which were not credible.
>
> The claimant was able to recall 3 items on the Rey Memory Test, which is indicative of malingering.

Dr. Finkel provided the following impression and summary:

> Test performance is clearly malingered. Test results are internally inconsistent and are not consistent with the claimant's presentation. He was able to provide a reasonable history and showed some knowledge of dates and numbers.
>
> This claimant may have genuine mental health problems. However, his malingered performance this date precludes an accurate assessment of possible difficulties.

There are no other records for the period of time between May 2003, when plaintiff was first released on parole, and November 2003, when he was arrested and returned to custody.

/ / /

/ / /

/ / /

A form entitled "Confidential Medical/Mental Health Transfer Local/State/ Federal" dated December 9, 2003, indicates a current diagnosis of depression and lists various psychiatric medications which were scheduled to stop in January 2004. An "Initial Health Screening" form dated this same day indicates "paranoia/depression."

2004

A CDCR mental health progress note dated January 22, 2004, indicates a diagnosis of "depressive disorder NOS." The note also indicates that plaintiff was upset about the discontinuation of Seroquel (an anti-psychotic medication) and suggests that "it appears patient may be 'drug seeking.'" The doctor noted that plaintiff was "very focused on Seroquel."

Physician's orders from March 2004 show various prescriptions for psychiatric medications, which at that time were Paxil and Trazodone.

Plaintiff was released again in May or June 2004 and filed the current application for benefits in July 2004.

On August 4, 2004, a social worker completed a "Parole Outpatient Clinic Status Report." The social worker concluded plaintiff had paranoid schizophrenia and amphetamine dependence. Plaintiff was assigned a GAF of 60. The social worker concluded that plaintiff was currently displaying psychotic symptoms, was complying with medications, and was not competent to manage funds on his own.

On September 25, 2004, agency examining physician Timothy Canty, M.D., performed a psychiatric evaluation incident to the current application. Plaintiff reported to Dr. Canty that he can't read or write and that "[t]he doctor at parole tells me I have schizophrenia." Regarding current medications, Dr. Canty reported:

> Risperdal, Paxil, Trazodone.
> All three bottles had a fill date of September 16, 2004, and I counted the medications. Not a single tablet was missing from any of the bottles. When he saw me counting them, he quickly explained that these were new and that he was using a previous supply. He then pointed out that his Paxil was only a partial fill and that he needed to get the remainder today. He also explained that the Paxil dosage was incorrect, that he

1         needed 40 mg rather than the 30 mg that were dispensed.

2         On mental status examination, plaintiff reported to Dr. Canty that he had been hearing voices since he was 12, but Dr. Canty "did not find this convincing." Dr. Canty also noted that plaintiff was "very vague about his symptoms." Regarding mood and affect, plaintiff initially stated that he is "[u]sually in a good mood," but then added that he is "quite often depressed and must isolate himself." Dr. Canty observed that plaintiff appeared to be in a good mood at the time of the evaluation. Plaintiff was oriented to day, date, month, and year. He could immediately recall six digits forward and three in reverse. He could recall three out of three objects in five minutes. Plaintiff also performed well on calculation and concentration tests. Dr. Canty diagnosed malingering with antisocial personality disorder. He assigned a GAF of 75 and added the following discussion:

> The claimant had a psychological evaluation in August of 2001 [by Dr. Richwerger]. At that time, he was not complaining of psychotic symptoms but was merely giving mild mood and cognitive complaints. His IQ at that time tested in the mentally retarded range. In September 2003, he had another psychological exam [by Dr. Finkel] and this time his complaints centered on hallucinations, depression, and illiteracy. He was clearly malingering during the testing portion. There is a note from a social worker dated August 4, of 2004. This is from the parole clinic. At that time he was self-reporting visual and auditory hallucinations. He was also given the diagnosis of amphetamine dependency although he denied ever using illegal drugs to me. There is only one conclusion that can be drawn from his various presentations and that is that he is malingering. His cognitive status today was clearly within normal limits and he pointed out getting the wrong dosage of Paxil which is not likely someone with mental retardation would do. He in no way appeared psychotic and denied having a drug history to me. I suspect that he is quite diligently manufacturing various symptoms in order to gain Social Security benefits. He has switched his tactics over the years ranging from mental retardation to psychosis. I suspect that he is not taking his medications and no doubt they would have little benefit for him. His parole treatment providers would benefit from reviewing his evaluations more closely.

Dr. Canty concluded by stating: "I wonder about the presence of substance abuse" and "I'm not convinced that he has any psychiatric disorder and his cognitive status appeared grossly normal on his exam today."

///

On October 12, 2004, agency consultative doctor Susan Regan, M.D., completed a mental residual functional capacity assessment based on review of the medical records. Dr. Regan concluded that plaintiff was not significantly limited in any category, except she noted moderate limitations in plaintiff's ability to: (1) perform activities within a schedule; (2) interact with the public; and (3) respond to changes in the work setting. She also reported that plaintiff was moderately limited in his activities of daily living and in maintaining social functioning, but was only mildly limited in maintaining persistence and pace. She did not note any episodes of decompensation.

2005

On March 9, 2005, agency consultative doctor Charlotte Bible, M.D., reviewed the medical records and agreed with Dr. Canty's assessment that plaintiff's GAF is 75 and that he is malingering. She also indicated that plaintiff is not credible given his denial of drug use where records indicate "drug seeking" and amphetamine dependency.

2006

In May 2006, plaintiff's attorney submitted to the Office of Disability Adjudication and Review additional CDCR records for the period from January through March 2006. A prison psychologist completed a "Mental Health Assessment: Reception Center Mental Health Evaluation" form on January 27, 2006. Plaintiff's appearance, behavior, and cognition were all within normal limits. Plaintiff reported auditory hallucinations "when not on meds." The reviewing doctor provided the following diagnosis:

> Inmate with a history of brain damage and severe episodes of depression with auditory "self harm" hallucinations after suicide attempt via reckless driving. . . .

The doctor concluded that plaintiff had a psychotic disorder due to brain trauma and assigned a GAF of 55.

Treatment notes from February 2, 2006, reveal that plaintiff complained of auditory and visual hallucinations and that he was depressed, irritable, and anxious. Plaintiff was

prescribed psychiatric medications.  By February 24, 2006, plaintiff reported that he was doing much better with medications.

Notes from March 2006 indicate a diagnosis of schizoaffective disorder with organic brain damage.  A note from March 9, 2006, indicates that plaintiff was in a coma for several days following the childhood auto accident.  Plaintiff was prescribed Seroquel, Paxil, and Cymbalta as "parole meds."  Parole was scheduled for March 25, 2006.

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## IV. DISCUSSION

In his motion for summary judgment, plaintiff raises one claim of error – he asserts that "the ALJ erred by failing to properly credit the opinions of his treating physicians at California Department of Corrections." Plaintiff describes the diagnoses of the CDCR doctors as follows:

> Plaintiff's treating doctors at CDC, diagnosed plaintiff with Schizoaffective Disorder, Major Depressive Disorder, brain damage with cognitive deficits.  Earlier, they had diagnosed him with Psychotic Disorder NOS and substance abuse disorder as well.  CDC treated his significant symptoms, including labile, blunt flat affect, delusions, auditory hallucinations, depression, mood swings, anger outbursts and anxiety with prescriptions for Seroquel, Risperdal, Trazodone, and Paxil.  CDC determined his usual GAF from 55 to 60.  CDC started treating plaintiff in 2002 and saw him for his mental illness over 40 times from 2002 to 2006.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional. See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional. See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical

13

findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. See Lester, 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional. See Lester, 81 F.3d at 830-31. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. See id. at 831. In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings. See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

As to the various medical opinions, the ALJ stated:

> Although the claimant may be mentally impaired the undersigned is unable to accept the severity proffered by the claimant's representative, i.e., that he meets the severity contemplated in the mental listings pertaining to psychotic disorders (section 12.03), or affective disorders (section 12.04). As noted above despite the claimant's assertions of hallucinations and other evidence of psychosis the consulting psychiatric evaluation found that the claimant was malingering in an attempt to obtain Social Security benefits. This assessment is well supported by the claimant's own statements in which he denied ever haring a problem with substance abuse despite multiple references in the records to an extensive history involving methamphetamine abuse – with which there is no doubt. The undersigned is therefore unable to credit the claimant's assertions regarding his alleged auditory hallucinations and related abnormal thought processes. Indeed, despite his recitation of these various psychotic symptoms none of the examining medical sources found any current evidence of such psychosis but rather based their findings on the claimant's own subjective reports. The record simply fails to provide any longitudinal history that would support the presence of any psychotic disorder. Similarly, although some depression may be understandable in light of the claimant's circumstances and he may have become tearful and appeared depressed during an examination or two the record simply fails to support the presence of the diagnostic criteria under section 12.04, i.e., the presence of at least 4 of the clinical signs under paragraph "A" of the listing. Although he may have a

poor appetite and have difficulty sleeping it has not been shown to be the result of a severe depressive or other affective disorder. Likewise, his assertions that he is always tired are not shown to be related to a depressive or other affective disorder. As to difficulty concentrating or thinking as noted above the comprehensive psychiatric examination demonstrated no such deficiencies. Rather he demonstrated an excellent capacity to attend and concentrate as evidenced by his completion of the various tasks required of him during the mental status examination. Again, hallucinations, paranoid thinking or other psychotic thought processes have not been independently corroborated. However, there is no dispute that the claimant has an antisocial personality disorder in view of his extensive history involving incarceration, drug abuse, and other antisocial behavior. However, the undersigned gives considerable weight to the state agency's reviewing psychiatrist who found no more than moderate functional limitations in the pertinent areas of functioning, including activities of daily living and social functioning, which is supported by the claimant's fairly wide range of activities (i.e., when not incarcerated). Although his living circumstances may have dictated a somewhat constricted lifestyle it appears to the undersigned that this is volitional activity in an attempt to stay out of harm's way to avoid re-offending and being returned to prison. Similarly, his somewhat constricted social functioning also is understandable in view of his need to not associate with other felons. No doubt with time as he mainstreams back in to society he will gain the confidence necessary to become more fully integrated in normal daily routines and social functioning. In any event, his level of restriction is not shown to have been of a "marked" degree for any continuous 12 month period nor is there an expectation that it will persist for at least 12 continuous months. The January 27, 2006 medical source statement indicating a GAF of 55 based on a one time examination through the Department of Corrections (and only three and a half months before the hearing) is not sufficient to document a longitudinal history demonstrating that level of impairment over any continuous 12 month period. In short, the evidence does not support a finding of disability pursuant to the mental listings.

Plaintiff argues that this analysis fails to give proper weight to the opinions and diagnoses of the CDCR treating physicians for two reasons. Plaintiff argues:

> . . . First, the opinion of the treating doctors were based on repeated examinations of the plaintiff, over 40, not a short examination; second, the opinion of the consultative examiner failed to consider the recent statement of the treating doctors that plaintiff was medication compliant just the month before the consultative examination. (TR 89-90) Finally, the opinion of the treating doctors is not controverted by clear and convincing evidence to the contrary.

The court finds that the ALJ's analysis is based on the correct legal framework

15

and supported by substantial evidence.  First, the extreme diagnoses assessed by the CDCR doctors are clearly contradicted by the opinions of the agency examining and consulting doctors.  Therefor, the ALJ was required to provide only specific and legitimate reasons for accepting their opinions over those of the CDCR doctors.  Second, the record clearly demonstrates that, while plaintiff may indeed have mental disorders, they do not limit his ability to perform work consistent with the residual functional capacity assessed by the ALJ.  Notably, Dr. Canty concluded in September 2004:  "I'm not convinced that he has any psychiatric disorder and his cognitive status appeared grossly normal on his exam today."  Drs. Regan and Bible agreed.  While CDCR records, particularly those from 2006, suggest a more serious mental impairment, they do not provide any specific assessment of plaintiff's functional capabilities and, therefore, do not undercut the agency doctors' opinions in this regard.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (Doc. 17) is denied;
2. Defendant's cross-motion for summary judgment (Doc. 18) is granted; and
3. The Clerk of the Court is directed to enter judgment and close this file.

DATED:  April 29, 2008

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE